UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE CLARK, next friend on behalf of J.J., a minor, | ) ) ) | |
| Plaintiff(s), | ) ) | |
| vs. | ) ) | Case No.4:10CV2128SNLJ |
| SPECIAL SCHOOL DISTRICT OF ST. LOUIS COUNTY, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM

Plaintiff Clark filed this action seeking judicial review of an administrative hearing panel's decision regarding the placement and provision of special education services for minor plaintiff JJ[1] pursuant to the Individuals with Disabilities Act (IDEA), 20 U.S.C. §1400 *et. seq.* This matter is before the Court on plaintiff Clark's motion for judgment on the administrative record [11], filed July 7, 2011 and defendant Special School District's (hereinafter referred to as "SSD") motion for judgment on the administrative record [15], filed July 8, 2011.  Extensive responsive pleadings, including the complete transcript of the subject administrative hearing, have all now been filed and the matter is ripe for disposition.[2]

---

[1]Although the minor plaintiff's name is disclosed via various pleadings and the written transcript of the administrative hearing and the hearing panel's decision, the Court will use the minor plaintiff's initials "JJ" to protect his identity in this cause of action with regard to the instant memorandum.

[2]The parties have requested the Court to rule on the basis of the administrative record, which consists of the following materials: 1) the transcript of the entire due process hearing held on August 23, 24, and 25, 2010 before a three-member panel empaneled in accordance with applicable Missouri law; 2) exhibits and briefs submitted in conjunction with that hearing; and 3) the Hearing Panel's unanimous decision.  Unless otherwise noted, the testimony referred to

J.J. is an elementary school-aged child.  At the time of the administrative hearing, he was approximately nine (9) years old and identified as a child with a disability in the area of "other health impaired" based on the medical diagnoses of attention deficit hyperactivity disorder and a seizure disorder.[3]  Although JJ has been evaluated[4] and found to exhibit certain "autistic-like" behaviors, he has not been clinically diagnosed as "autistic".

Prior to entering kindergarten, JJ's mother testified that he was prone to tantrums, both at home and in preschool, when he did not get his way.  She further testified that she was inconsistent with disciplining him.

**2007-08 School Year**

During the 2007-08 school year, JJ lived with his mother plaintiff Clark (in the Parkway School District[5]).  In August 2007 JJ was enrolled in the half-day kindergarten program, attending the afternoon session, at Craig Elementary School in the Parkway School District.  On September 11, 2007 JJ was suspended (a one day out-of-school suspension) from school for disruptive behavior including refusing to follow directions from the teacher, yelling at the teacher, and trying to hit the principal.

---

herein was received by the Hearing Panel at the due process hearing.

[3]The parties have agreed that the findings of fact of the majority decision of the hearing panel shall be deemed *prima facie* correct, and any party's objections to said facts shall be noted by the Court.  For the most part, the facts, as found by the Hearing Panel, are undisputed; however, the Court does note that the parties have submitted "additional facts" regarding JJ's homebound placement at the University City Public Library while his IEPs were being disputed.

[4]JJ has been evaluated by autism experts from Touch Point, f/k/a, Judevine.

[5]There is no dispute that defendant Special School District (SSD) is an independent special school district providing education and training of handicapped and severely handicapped children residing within the boundaries of St. Louis County school districts comprising the SSD. The Parkway School District and the University City School District are two (2) component districts of SSD.

Ms. Clark then enrolled JJ in a parochial school; however, he exhibited behavior problems there also. On or about December 7, 2007 Clark reenrolled JJ at Craig Elementary School. On December 13, 2007 JJ was given a one day out-of-school suspension for refusing to follow directions, destruction of the classroom environment, spitting, and attempting to destroy school property.

Following JJ's return to the classroom at Craig, he was referred, with his mother's written consent, for a special education evaluation by SSD in the area of social/emotional behaviors. From January 2008 through April 2008, the scope of JJ's evaluation was broadened, with his mother's consent, to a cognitive assessment and review of his task-related behaviors. Ms. Clark agreed to provide SSD with documentation of JJ's Attention Deficit Hyperactivity Disorder. Documentation of JJ's Attention Deficit Hyperactivity Disorder and seizure disorder were provided to SSD on or about May 13, 2008.

Meanwhile, while SSD's evaluation was progressing, he was suspended for a third time from Craig for being destructive and kicking a teacher assistant several times.

On May 20, 2008, the eligibility team met to consider the completed evaluation. Based on his medical diagnoses of Attention Deficit Hyperactivity Disorder and seizure disorder, the eligibility team found that JJ met the eligibility criteria for the disability "other health impaired".[6]

SSD assembled an "IEP"[7] team which developed an initial IEP for JJ on May 22, 2008, next to the last day of the 2007-08 school year. The present level of academic achievement and functional performance (PLAAFP) in the May 2008 IEP noted that JJ needed clearly established

---

[6]There is no dispute regarding JJ's disability eligibility or being identified as a child with a disability in the area of other health impaired.

[7]Individualized Education Plan

rules and expectations, preferential seating in the front of the classroom, sensory items, and testing in small groups. The May 2008 IEP noted that JJ demonstrated difficulty with changes in routine or task demands, difficulty with considering consequences before acting, difficulty with completing assignments, difficulty with following school and classroom rules, and difficulty with peer and adult interactions.  The May 2008 IEP further noted that JJ's "meltdowns" were usually marked by kicking, throwing items, and spitting - all behaviors which tended to escalate unless immediately addressed.  Although Ms. Clark was aware of JJ's medical diagnosis of Attention Deficit Hyperactivity Disorder (ADHD), she informed the IEP team that JJ was not taking medication for the ADHD and that she preferred he not be prescribed medication to address his ADHD.

The May 2008 IEP team decided to address JJ's behaviors through concrete IEP goals and accommodations.  The IEP team developed three (3) goals addressing 1) time on task; 2) the social skill of verbally expressing wants/needs; and 3) the social skill of transitioning within/between environments.  The May 2008 IEP called for 150 minutes per week of instruction in social skills and 150 minutes per week of instruction in task-related skills, both in a special education setting.  The placement contemplated for JJ, at this time, was outside regular education less than 21% of the time.  Ms. Clark signed consent for initial placement on May 23, 2008 under the May 2008 IEP.

**2008-09 School Year**

JJ started First Grade at Craig on August 14, 2008.  On or about August 27, 2008 Ms. Clark withdrew JJ from school and enrolled him again in a parochial school.

While JJ was at Craig from August 14-27, 2008 SSD conducted a Functional Behavioral Assessment (FBA) utilizing an assessment instrument called Project FACILE.  During this two-

4

week behavior assessment period, JJ's special education teacher reported that JJ engaged in the following behaviors: disrespectful to adults, running away from adults, physical aggression, throwing objects, knocking over furniture, climbing on furniture, and kicking people and/or objects.  Although JJ initially was able to spend some time in the general education setting, as his behavior deteriorated, he was spending less time in the general education setting.  His behavior deteriorated as expectations such as joining his classmates as a group on the carpet, sitting in his desk, taking out and using paper and pencil, and raising his hand before speaking were placed upon him.  During this two-week period, SSD and Parkway staff addressed JJ's deteriorating behavior by implementing  a variety of accommodations, including preferential seating, allowing for movement in the classroom, giving directions in a variety of ways, using non-verbal cues and prompts, checking for understanding, frequent eye contact, teacher proximity, breaks, and varying activities.

On September 19, 2008, Ms. Clark reenrolled JJ at Craig and he returned to class on September 22, 2008.  JJ's IEP team was immediately reconvened and met with Ms. Clark to discuss his IEP.  The IEP team increased the amount of time JJ spent in the special education setting to 1824 minutes per week and had a social worker available to consult with Ms. Clark and JJ's teachers.  The September 2008 IEP noted that JJ's behaviors included: poor listening skills, being disrespectful to adults (evidenced by JJ saying "no" in a loud voice), running away from adults, physical aggression, throwing objects, knocking over furniture, climbing on furniture, and kicking objects and/or people.  Additional interventions and accommodations were incorporated into the September 2008 IEP such as using a visual (picture) schedule, pre-mack scheduling, and advance notice of transitions.  The IEP team agreed to reconvene on October 6, 2008.

During the two-week period between September 22 and October 6, 2008, JJ was supervised on a 2:1 (teachers:student) basis with three (3) special education teachers, trained to work with children exhibiting difficult behaviors, rotated in and out of JJ's classroom.  During this time-period JJ was observed engaging in extremely disruptive behavior, including overturning furniture, throwing books and other classroom objects, and hanging from metal ceiling tile brackets[8].  JJ was observed in engaging in such behaviors at least 50% of his classroom time.

On October 6, 2008 the IEP reconvened and met with Ms. Clark.  The October 2008 IEP meeting included not only JJ's IEP team, Ms. Clark, JJ's maternal grandmother, but also personnel from alternative placement options; i.e., public separate day facilities.  JJ's October 2008 IEP called from a shortened school day for one (1) week at Craig (including 750 minutes of special education), then JJ transferring to a public separate day school.  All the educators present at the meeting agreed with the proposed change of placement for JJ.  The October 2008 IEP noted that the reason for the proposed change of placement to a public separate day facility was due to safety concerns for JJ and his classmates.  JJ's special education teacher at Craig further noted that his behavior was impeding his own learning, as well as the learning of his classmates.

The October IEP had four (4) goals for JJ: 1) initiating tasks, 2) self-advocacy, 3) social skills for transitioning, and 4) social skills of keeping hands, feet, and objects to himself.  The October IEP provided for 590 minutes per week of instruction in task related skills, 590 minutes per week of instruction in social skills, 590 minutes per week of instruction in self-advocacy, and 30 minutes per week of direct social work services.  The October IEP further included the use of

---

[8]The Court notes that plaintiff Clark disputes the Hearing Panel's finding of fact regarding JJ's "hanging from metal brackets that hold ceiling tiles in place".

a support room and a secure observation room (SOR), as accommodations when necessary, to address JJ's dangerous behaviors.  JJ was assigned to attend Litzsinger School.  Ms. Clark toured Litzsinger School and although was not completely secure in sending JJ there, she did ultimately consent to the placement.

JJ began attending Litzsinger School on October 13, 2008. Students with behavior issues are placed at a separate public day school, such as Litzsinger, because they have demonstrated extreme behaviors that are not manageable in the general education setting.  Litzsinger's staff is trained in non-violent crisis intervention such that the entire learning environment at Litzsinger is imbued with a unified behavior prevention/intervention approach.  Furthermore, Litzsinger has a crisis team in place that includes school nurses, social workers, administrators, teachers, and paraprofessionals who are available whenever a student exhibits extreme behaviors.  Members of the crisis team are chosen based on availability and demeanor in that they are persons who are calm, flexible, and student-centered.  Litzsinger administrators try to limit the number of people who are pulled out of classrooms and to spread those selected for the crisis team among the various layers of staff.

Litzsinger School also has a school-wide behavior support system in place.  The school-wide behavior support system focuses on three (3) expectations: 1) be safe, 2) be kind, and 3) be responsible.  Students can earn "paw prints" which can be redeemed for activities or items from the school store.

JJ's October2008 IEP, as previously noted, included the use of a support room and a secure observation room (SOR), when necessary, to address JJ's extreme and/or dangerous behaviors.  The support room is a regular-sized classroom where a student can go to take a break, to refocus, and to complete work in a quiet area.  In the support room, during the relevant time-

period, were a beanbag chair, a weighted blanket with pad, a teacher's desk, a couple of students' desks, a video monitor, a sink, and storage area.  There is an observation window through which someone can observe from an adjoining room.

There are two (2) SORs located within the support room.  The SORs are small rooms with padded walls and floor.  They are lighted.  Each has an air vent and a window in the door.  Each is equipped with a video camera, permitting the student to be observed at all times.  Each is also equipped with a magnetic locking door.  On the wall immediately outside the door of each SOR is a button which operates the door.  In order to engage the magnetic lock, the door must be completely closed and the button pushed.  The lock works only so long as the button remains pushed.  As soon as the button is released, the door unlocks and disengages.  The door can be locked and remain locked only if someone is within arm's length of the door.

Litzsinger staff completed written reports whenever a student, including JJ, was sent to either the support room or one of the SORs.  These reports would indicate whether or not it was necessary to physically escort, "hands on", the student to the support room or the SOR.

During the 2008-09 school year JJ was sent to either the support room or one of the SORs as follows:

> October:        9 referrals
> November:   29 referrals
> December:   18 referrals
> January (2009): 12 referrals
> February:       9 referrals
> March:          7 referrals
> April:          1 referral
> May:            3 referrals

For the overwhelming majority of the referrals it was not necessary to physically escort JJ to the support room and/or SOR.  However, although he was not physically escorted to the room, he

still was observed throwing chairs, kicking walls and kicking classroom doors on his way to the support room and/or SOR.

JJ's teacher at Litzsinger during the 2008-09 school year was Ms. Brenda Engelhardt. Ms. Engelhardt was a veteran teacher with degrees in both elementary and special education.  As of the 2008-09 school year she had been teaching at Litzsinger approximately twelve (12) years, specializing in working with autistic children.  Ms. Engelhardt testified at the hearing that JJ exhibited the following behaviors while in her classroom: physically aggressive toward staff, physically aggressive toward his peers, kicking, hitting, spitting, attempting to bite, slamming desks, slamming doors, and throwing school supplies.  She testified that in her twelve years at Litzsinger working with children who have presented with some of the most extreme and challenging behaviors, JJ presented as a student with some of the more intense behaviors.

Ms. Engelhardt's classroom had a range of four (4) to eight (8) students.  She was assisted at any given time by two or three paraprofessionals.  She testified that JJ's behaviors were triggered by wanting attention from adults and task avoidance.  She tried a variety of strategies with JJ, including visuals for daily schedule, visuals for behavior mapping, visuals for rules and consequences, rules for expectations and routines, verbal cues, verbal prompts, consistent structure throughout the day, previewing changes in schedule, timeout, one-on-one instruction, academic breaks, sensory input, and a token system.  These strategies were used in conjunction with the school-wide positive support system.

Ms. Engelhardt only used the support room and/or the SOR for safety purposes after she had exhausted other strategies to keep JJ in the classroom safely.  As the school year progressed, the behavior intervention strategies were effectively addressing JJ's behavior concerns as the number of monthly referrals decreased.

9

Ms. Engelhardt never observed any inappropriate behavior on the part of staff with respect to their interactions with JJ.  During one referral (on May 4, 2009), in which JJ was **not** physically escorted to the support room, he injured his finger when he kicked open the door to the support room and it flew back pinching his finger.   JJ received medical attention at the school and his mother was notified of the incident.

Ms. Clark believed that one of the paraprofessionals "man-handled" JJ resulting in the finger injury.  She hot-lined the paraprofessional to the Missouri Children's Division.[9] The finger incident was investigated and the paraprofessional was exonerated.[10] JJ later admitted to his teacher that he had lied to his mother about the door-kicking incident.

SSD amended the October 2008 IEP to make extended school year services available to JJ but his mother chose not to take advantage of the offer for the summer of 2009.

**2009-10 School Year**

At the beginning of the school year JJ was no longer residing with his mother and was residing with his father within the University City School District.

Neither of his parents sent JJ to Litzsinger the first day of school; instead, demanding an IEP meeting.  JJ's IEP team met on August 24, 2009.  JJ's parents wanted a new IEP which did not include any use whatsoever of the support room and/or the SOR.  The consensus of the educators was that use of the support room and/or SOR should remain in JJ's IEP as accommodations to address safety issues when JJ engaged in aggressive behaviors.  Although the

---

[9]Although not in the Hearing Panel's findings of fact, Ms. Clark also testified that JJ had told her that at some point in time when he had been sent to the SOR, Dan Kelly (the assistant principal) had thrown him into a carrel in the room.  She testified that she had reported both incidents to the Missouri Children's Division.  Transcript I - pgs. 163-64; 181-82.

[10]According to Ms. Clark's testimony, the alleged incident involving Mr. Kelly was also investigated and Mr. Kelly was exonerated.

use of the SOR remained in JJ's IEP, JJ's parents and SSD officials agreed that it would not be used, at least for awhile, when JJ first returned to school.  Furthermore, SSD agreed to consult with Touch Point, a private agency that works with students who exhibit difficult behaviors, most often being autistic children exhibit such behaviors.

JJ returned to Litzsinger shortly after the August 24, 2009 IEP meeting.  JJ's classroom teacher was Kathy Passanisi, a veteran special education teacher holding both undergraduate and master's degrees in education, as well as certification in the special education areas of mental retardation, behavior disorders, and learning disabilities.  She has extensive work experience with students who exhibited extreme behaviors.

During this period of time when use of the SOR for JJ was not available, JJ's behavior was very intense and his education "very sporadic".  He was referred to the support room on more than one occasion and during one such referral Ms. Passanisi observed JJ move towards staff in a threatening manner, kick, hit, throw, spit, and make gun sounds with his hand in the shape of a pistol while point his index finger.  Although staff were not allowed to refer JJ to the SOR, on at least one occasion, JJ himself voluntarily walked into the SOR.

Without the use of the SOR available to staff, Ms. Passanisi was subjected to being hit, kicked, and injured by JJ.  One particularly intense incident was recounted by JJ's social worker, Kelli Traxler:

> "He **[JJ]** had been quite physical that day.  I had been called --
> I had him about 9:45 in the morning to -- over the walkie-talkie,
> as part of the crisis team, to assist with him.
>
> He displayed several behaviors and we tried different strategies
> to get him to calm down; and we ended up in a room at the end
> of our hallway, one of our support rooms.  It wasn't the main
> support room, but it was kind of a room next to it.
>
> And while we were in there, he kept coming after me.  And he

11

had a chair - - and Mr. Kelly was in there with me.  And he had
a chair, and he kept coming at me with the chair; and I would try to
hold it and to keep it from hitting me.  And he got me cornered at one
point and was pushing the chair into me.  Dan came out,
helped me get the chair removed from his hands; and he **[Mr. Kelly]**[11]
asked me to come behind a blue carrel that Mr. Kelly had put
himself behind.

So the two of us were standing with our backs against the wall with a
blue carrel surrounding us and **[JJ]**[12] was in front of us.  And he - -
**[JJ]** kept - - just kept coming at us trying to hit us, kick us, spit.  He was
trying to grab on to Mr. Kelly's arm.  And in the process, I believe he got
his arm scraped on the carrel.

Ms. Traxler further testified that during that incident JJ had bit her shirt intensely enough to put a

hole in it and ruin the shirt.  Transcript III, pg. 544.

Touch Point, which had been contacted to evaluate JJ and his aggressive behaviors,

reported that: "Student admitted the following behaviors: Biting, scratching, pinching, hitting,

punching, kicking, head-butting, spitting, pushing, head-banging, screaming, throwing items, hair

pulling, climbing on furniture and walls, jumping off of furniture, leaving the area, hanging from

the ceiling, and ripping items off the walls.  Some of these behaviors resulted in injuries to staff

and damage to property."  Touch Point confirmed that the use of a SOR was a necessary

component of JJ's educational program.

---

[11]Although the Hearing Panel transcript refers to Mr. Kelly by name, the Hearing Panel's
written decision when referring to Ms. Traxler's testimony refers to "the principal".  Mr. Dan
Kelly, is actually the assistant principal at Litzsinger School. The Court prefers to cite to her
testimony as provided in the written transcript for accuracy. Her complete testimony regarding
this incident clearly indicates that it was Dan Kelly, the assistant principal in the support room
with her and JJ.  Transcript III, pgs. 537-540; 544-45.

[12]Again, the written transcript of Ms. Traxler's testimony regarding this incident uses JJ's
actual name; and the Hearing Panel's written decision uses "student".  Although the Court will
not use JJ's actual name, the Court's opinion will use "JJ" as a substitute for said name in Ms.
Traxler's testimony.

JJ continued to engage in dangerous and disruptive behaviors and the school tried a number of alternative interventions.  They tried walks with the social worker, sending JJ to different classrooms, sending JJ to different areas of the school, sending JJ to the principal's office, and utilizing Touch Point staff.

Ultimately, JJ's aggressive behavior resulted in two (2) out-of-school suspensions.  JJ's IEP team was reconvened to consider JJ's behavior.  A series of meetings over several weeks were held among JJ's educators, his parents, and Touch Point staff.  JJ could have returned to Litzsinger; however the IEP team declined to remove the use of the SOR from JJ's IEP.  JJ's parents were adamant about use of the SOR being removed from his IEP.  They refused to send JJ back to Litzsinger or to any SSD public separate day facility as long as the use of a SOR was in his IEP.

Eventually, SSD and JJ's parents agreed that until such time JJ's school placement was mutually decided upon, SSD would provide JJ with "homebound" services at the University City Public Library.  At the library, JJ receives "one-on-one" instruction from Ms. Cheryl Jackson, a special education teacher.[13]  His educational services have been provided in various sections of the library away from any interactions with other children.  Transcript III, pgs. 550-551; 559.  He has always been at a table by himself (no other children seated with him) with his mother and a Touch Point staff member always present and close by.  Transcript II, pgs. 316, 319-20, 328, 333-35, 337-38; Transcript III, pgs. 551-52, 553, 563, 570-72.  Ms. Jackson implemented JJ's November 2009 IEP which included a Behavior Intervention Plan.  Transcript III, pgs. 548-49.

_____

[13]Although somewhat unclear, it appears that JJ was only in school approximately eleven days prior to the second suspension and that his parents did not return him to school.  However, the IEP team, the Touch Point staff, and JJ's parents continued to meet in order to come to some agreement over JJ's IEP and his behavior intervention plan.  The series of meetings ultimately resulted in a November 4, 2009 IEP which did include the use of a SOR.

13

During his homebound instruction, JJ has exhibited behaviors similar to the ones he exhibited at Litzsinger but not as extreme such as: not staying on task, squirming in his seat, pulling on his clothing, pushing books off the table, scratching in his books, throwing objects such as an eraser, kicking, biting himself.  Transcript III, pgs. 546-562.  At times, he would attempt to engage his mother in conversation instead of doing his work.  Transcript III, pg. 553.  Ms. Jackson implemented several of the strategies used at Litzsinger to address JJ's inappropriate behaviors: taking breaks on a regular basis, verbalizing his frustrations, verbal positive reinforcement, taking walks when he was extremely agitated.  Transcript III, pgs. 549-64.

Although JJ was making strides in both his academic and behavioral progress, Ms. Jackson testified that this was due in large part to the library "one-on-one" setting.  She recognized that she was able to address his behaviors quicker than in a classroom setting because JJ was her only student.  Transcript III, pgs. 563-64.  She testified that she did not believe that JJ would benefit from "one-on-one" teaching in a general education setting; that such a setting would not provide JJ with the seclusion he requires and/or the behavior support he requires. Transcript III. pgs. 564-65.  She further testified that although she would like to see JJ in a general education setting; i.e., a classroom with other children, she did not believe that JJ was ready for such a setting.  She preferred that JJ be placed again in a public separate day facility such as Litzsinger.  Transcript III, pgs. 565-67, 573.

Plaintiff Clark requested a due process hearing regarding her desire that JJ's IEP not include use of a SOR and that JJ be returned to a general education setting with certain services and supports including but not limited to a "shadow"[14] and "one-on-one" instruction.  A three(3) day hearing was held before a three(3) member panel in August 2010.  Numerous individuals

---

[14]Generally, this is a person assigned to stay with a child throughout the school day.

testified, including but not limited to, JJ's mother (plaintiff Clark), Parkway School District educators, SSD administrators, JJ's teachers at Litzsinger, Touch Point administrators, JJ's social worker(s), University City Library personnel, and various outside consultants. The issues brought before the Hearing Panel were: 1) whether SSD offered JJ a "free appropriate public education" (FAPE) in the least restrictive environment by transferring him from a general education setting with special education services to a public separate day facility; 2) whether use of the support rooms and/or SORs as part of JJ's IEP endangered JJ and were inappropriate for JJ; and 3) whether SSD failed to conduct and/or implement a timely Functional Behavioral Analysis (FBA).[15]

The filing of the due process hearing complaint triggered the "stay-put" provisions of the IDEA requiring the SSD to continue to provide JJ with homebound services during the Hearing Panel's procedures, and the pendency of this litigation.[16]

On or about September 27th, 2010 the Hearing Panel unanimously decided that JJ's parents failed to sustain their burden that a FAPE could be offered to JJ in a general education setting and without the accommodation of a SOR. Following the Hearing Panel's decision, Ms. Clark filed the instant lawsuit seeking judicial review of the Hearing Panel's decision, and an

---

[15]Plaintiff Clark originally filed a complaint with the Hearing Panel raising ten (10) problems; however the Hearing Panel integrated these problems into the issues set forth above. The Panel actually addressed the first two in the majority decision and the third panel member, Dayna Deck, in a separate concurring opinion, addressed the third issue regarding the FBA. However, all the members of the Hearing Panel agreed upon the ultimate decision that SSD provided a FAPE to JJ by placing him at Litzsinger and that his IEPs, including the use of a support room and/or SOR, did not violate the IDEA.

[16]The Court is currently unaware of JJ's placement at this time; i.e. whether it be homebound services or placement in some type of educational facility.

order enjoining SSD from changing JJ's educational placement back to a public separate day facility pursuant to any IEP which includes use of a support room and/or SOR.

The Individuals with Disabilities Act (IDEA) requires all school districts receiving federal funds under the IDEA to provide a qualifying child[17] with access to a "free and appropriate public education."[18]. Fort Osage R-1 School District v. Sims, 641 F.3d. 996, 1002 (8th Cir. 2011) *citing* C.N. v. Wilmar Public School Indep. School District, No. 347, 591 F.3d. 624, 630 (8th Cir. 2010); 20 U.S.C. §1400(d)(1)(A). A FAPE requires special education and related services to be provided to the disabled child in accordance with applicable state education standards, and that such services be provided in an appropriate learning environment, and in conformity with a specialized education plan (IEP) as required by 20 U.S.C. §1401(a)(8)(A)-(D). *See*, J.L. v. Francis Howell R-3 School Dist., 693 F.Supp.2d. 1009, 1011-12 (E.D.Mo. 2010)(citations omitted). Since each child's needs and abilities are unique, the law does not require the acquisition of specific knowledge or "strict equality of opportunity or services.". Lathrop R-II School Dist. v. Gray, 611 F.3d. 419, 424 (8th Cir. 2010) *quoting* Board of Education v. Rowley, 458 U.S. 176, 198 (1982). The IDEA does not require a school district to provide a FAPE to maximize a child's potential or to even guarantee that the student actually make any progress at all. Lathrop, at 424 *citing* CJN v. Minneapolis Pub. Sch., 323 F.3d. 630, 642 (8th Cir. 2003); *see also*, 34 C.F.R. §300.350.

Under the IDEA, at the beginning of each school year, a school district must devised for each child with a disability an IEP. Park Hill School District v. Dass, 655 F.3d. 762, 765-66 (8th

---

[17]a child who is determined to be "disabled" under the provisions of the IDEA

[18]As previously noted, the phrase "free and appropriate public education" is often referred to as a "FAPE".

Cir. 2011); <u>Fort Osage</u>, at 1002; 20 U.S.C. §1414(d)(2)(A).  The IEP is a "written statement . . . that is developed, reviewed, and revised in accordance with section 1414(d)."  <u>Park Hill</u>, *citing* 20 U.S.C. §1401(14).  An appropriate IEP under the IDEA must comply with the IDEA's procedural requirements, and must be "reasonably calculated" to provide some educational benefit for the child.  <u>Park Hill</u>, at 765-66 *citing* <u>Gill v. Columbia 93 Sch. Dist.</u>, 217 F.3d. 1027, 1035 (8th Cir. 2000)(*citing* <u>Bd. of Educ. v. Rowley</u>, 458 U.S. at 201); <u>Fort Osage</u>, at 1002 *citing* <u>C.B. *ex. rel* B.B. v. Special Sch. Dist., No. 1, Minneapolis, Minn.</u>, 636 F.3d. 981, 989 (8th cir. 2011)(*citing* <u>Bd. of Educ. v. Rowley</u>, 458 U.S. at 206-07).  "'Some educational benefit' is sufficient; a school need not `maximize a student's potential or provide the best possible education at public expense.'"  <u>Park Hill</u>, at 766 *quoting* <u>Lathrop</u>, at 427; *see also*, <u>Fort Osage</u>, at 1003 *citing* <u>Fort Zumwalt Sch. Dist. v. Clynes</u>, 119 F.3d. 607, 612 (8th cir. 1997).  Furthermore, a court must not require more from an IEP than what is required under §1414(d).  <u>Park Hill</u>, at 766 *citing* <u>Fort Osage</u>, at 1003 (citation omitted).

An IEP for any child should include, but not be limited to, a statement of the child's present levels of academic and functional performance, measurable annual goals, a description as to how progress will be measured, a statement of educational and related services to be provided to the child, an explanation of the extent to which the child will not be in a regular classroom, a statement of accommodations necessary to measure achievement, and the date upon which the educational and related services will commence.  *See,* <u>Park Hill</u>, at 766.  "In addition, §1414(d) requires that the IEP Team `in the case of a child whose behavior impedes the child's learning or that of others, *consider* the use of positive behavioral interventions . . . and other strategies.'" <u>Park Hill</u>, at 766 *quoting* <u>Lathrop</u>, at 424 (citation omitted)(emphasis added); <u>K.E. v. Independent School Dist. No. 15</u>, 647 F.3d. 795, 810 (8th Cir. 2011) *see also*, 20 U.S.C.

§1414(d)(3)(B)(i); 20 U.S.C. §1415(f)(3)(E).  The IDEA only requires that an IEP include "transition services" and a "behavioral intervention plan"[19] in limited circumstances.  Park Hill, at 766.  Since the IDEA only requires an IEP team to "consider" the use of behavior interventions and other strategies when a child's behavior is impeding learning, the absence of any IEP provisions addressing transition and/or behavior issues does not, standing alone, violate the IDEA or deprive a disabled child of a FAPE.  Park Hill, at 766 *citing* Lathrop, at 426 (citations omitted).

Any parent who disagrees with his/her child's IEP may seek review of the school district's actions through a state administrative due process hearing.[20]  Furthermore, any party aggrieved by the outcome of the state administrative due process hearing may file suit in state court or federal district court pursuant to 20 U.S.C. §1415(i)(2).  Fort Osage, at 1002; School Bd. of Independent School Dist. No. 11 v. Renollett, 440 F.3d 1007, 1010 (8th Cir. 2006).  If filed in federal court, the district court must review the state administrative record, hear additional evidence (if requested), and "independently determine the appropriate relief based on a preponderance of the evidence, `while still giving `due weight to the factual findings of the administrative panel'".  Fort Osage, at 1002 *quoting* Hansen ex. rel. J.H. v. Republic R-III Sch. Dist., 632 F.3d 1024, 1026 (8th Cir. 2011); K.E. v. Indep. School Dist. No. 15, at 803; Renollett, at 1011; Lathrop, at 423-24;  CJN v. Minneapolis Pub. School Dist., 323 F.3d 630, 636 (8th Cir. 2003). The district court must give `due weight' because the administrative panel had an opportunity to observe the demeanor of the witnesses. K.E. v. Indep. Sch. Dist. No. 15, at

---

[19]Often referred to in relevant caselaw as a "BIP".

[20]In Missouri, the state administrative process mandated by the IDEA is governed by Missouri statute §162.961 *et. seq.*

803; Renollett, at 1010-11 *citing* CJN, at 636.  Furthermore, the district court must not substitute

its "own notions of sound educational policy for those of the school authorities which they

review.".  Fort Osage, at 1002 *quoting* Rowley, 458 U.S. at 206; K.E. v. Indep. Sch. Dist. No. 15,

at 803; Renollett, at 1011.  Finally, the burden of persuasion/proof in an administrative

proceeding challenging an IEP is placed upon the party seeking relief.  Schaeffer v. Weast, 546

U.S. 49 (2005); *see*, Park Hill, at 765 (parents as the party challenging the IEP have the burden of

persuasion); Lathrop, at 423-24 (parent ast the party challenging the IEP has the burden of

persuasion).

Whether a school district has provided a disabled child with a FAPE is a mixed question

of fact and law.  K.E. v. Indep. School Dist. No. 15, at 804; C.J.N., at 637.  When reviewing a

school district's compliance with the IDEA, a district court should engage in a two-part inquiry:

1) whether the school district followed the procedures set forth in the IDEA formulated to create

an IEP tailored to meet the disabled child's unique needs; and 2) whether the resulting IEP was

"reasonably calculated to enable the child to receive educational benefits".  K.E. v. Indep. Sch.

Dist. No. 15, at 804; Fort Osage, at 1003; Renollett, at 1011.  If the school district has met these

requirements, it "has complied with the obligations imposed by Congress and the courts can

require no more."  Renollett, at 1011 *quoting* Rowley, 458 U.S. at 207; *see also*, K.E. v. Indep.

Sch. Dist. No. 15, at 804 (*citing* Rowley, *supra.*).

As stated previously, in order to satisfy the procedural requirements of the IDEA, a

school district must follow the procedures set forth in the IDEA to formulate an IEP tailored to

meet the disabled child's specific needs, and a district court should only set aside an IEP on

procedural grounds when the "procedural inadequacies compromised the pupil's right to an

appropriate education, seriously hampered the parents' opportunity to participate in the

formulation process, or caused a deprivation of educational benefits.".  Fort Osage, at 1002-03

*quoting* Lathrop, at 424 (internal citations omitted); Renollett, at 1011 (citation omitted); *see*

*also*, K. E. v. Indep. Sch. Dist. No. 15, at 804-05.  To satisfy the substantive requirements of the

IDEA, again, the IEP only need to be "reasonably calculated to enable the child to receive

educational benefits" and as such this standard is met when the IEP provides educational and

related services sufficient to provide the disabled child with **some** educational benefit.  Fort

Osage, at 1003.  Again, the school district is not required to either maximize the child's potential

or provide the best possible education at the public expense.  Fort Osage, at 1003 (citations

omitted).

  The record before this Court contains evidence of JJ's performance both at Craig

Elementary School, Litzsinger School, and his homebound instruction at the University City

Public Library.  The hearing transcript is three (3) volumes approximately 575 pages long

consisting of the testimony concerning JJ's academic and behavioral performance at Craig

Elementary School, Litzsinger School, and the University City Public Library, and by the

teachers, therapist, and behavioral experts who had worked with JJ and/or observed JJ over an

extended period of time.  Witnesses testified at great length about the various types of teaching

instruction which had been proposed and tried with JJ, and the various disciplinary methods

utilized with JJ.  All witnesses were subject to cross-examination and to questioning by the

parties' attorneys and by the Hearing Panel members.  Over 150 exhibits were made part of the

administrative record, including but not limited to, JJ's IEPs, results of diagnostic tests on JJ by

assorted educational experts, a multitude of behavior incident reports, and certain academic

reports regarding JJ' academic progress.

It is difficult to discern clearly from the plaintiff's pleadings as the exact nature of her dispute; i.e., whether she is asserting procedural and/or substantive violations of the IDEA. It does not appear that she is alleging that JJ failed to make academic progress. Instead, it appears that the crux of her dispute with the SSD, and ultimately with the Hearing Panel's decision, is the manner in which JJ's behavior problems were addressed. She believes that JJ's IEPs were deficient because they failed to include a timely written BIP. She further believes that this deficiency, coupled with the SSD's decision to transfer JJ to Litzsinger and incorporate the use of a support room and/or SOR, failed to provide JJ with a FAPE. The SSD believes that plaintiff has "abandoned" her argument regarding the inappropriate use of the SOR; however, the Court does not find that plaintiff has actually "abandoned" this issue but rather has made it part of her assertion that Litzsinger, due to JJ's IEPs including use of the SOR, is not "least restrictive environment" for educating JJ as required by the IDEA.

Since academic progress alone does not automatically mean a child has received a FAPE, especially if that child has a behavioral disability, the Court must look at JJ's IEPs on whether they (especially his October 2008 IEP) were "responsive to the student's **[JJ]** specific disabilities, whether academic or behavioral.". K.E. v. Indep. Sch. Dist. No. 15, at 809 *quoting* CJN, at 642.

Thus, given the posture of the case before this Court, there are primarily two (2) issues before this Court for resolution:

> 1) Whether the Hearing Panel erred when it found that the SSD had made a FAPE available to JJ when it transferred JJ from a general education setting with special education services (Craig Elementary School) to a public separate day school (Litzsinger) under an IEP which includes the use of a SOR as an accommodation; and

> 2) whether the Hearing Panel erred in finding that Litzsinger, a self-contained special education facility with access to support and secure

observation rooms, was the "least restrictive environment" under the IDEA for JJ.

Plaintiff argues that SSD should have conducted a full functional behavioral assessment and such assessment should have been made a part of his IEPs prior to his transfer to Litzsinger for the 2008-09 school year. She argues that SSD's failure to timely develop and implement an appropriate IEP with an appropriate written BIP prior to JJ's transfer to Litzsinger deprived JJ of a FAPE in the least restrictive environment. She cites Lathrop, *supra.* and Neosho v. Clark, 315 F.3d. 1022 (8th Cir. 2003) as being dispositive of this matter. The SSD argues that these cases are inapposite. Upon review of these cases, the Court finds them instructive but not dispositive of the present dispute.

Neither Missouri nor federal law requires a written BIP to be attached to an IEP. Lathrop, at 425-26; Renollett, at 1011. "The IDEA does not mandate the inclusion in an IEP of a behavior plan, let alone behavioral improvements." Lathrop, at 426 (internal citation omitted). The IDEA does not require an IEP to have specific behavior goals. Lathrop, at 425. "If a behavior impedes a child's learning, the IEP team need only `consider*, when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior[.]'". Lathrop, at 425 *quoting* 20 U.S.C. §1414(d)(3)(B)(i)(emphasis added).

JJ's IEPs consistently addressed his behavior problems. Defendant SSD conducted (or at least caused to be conducted) two FBAs. Once JJ was identified as a disabled child under the auspices of the IDEA, an initial FBA was conducted at the onset of the 2008-09 school year.[21]

---

[21] Prior to JJ's assessment as a disabled child pursuant to the IDEA, during the 2007-08 school year, JJ was subject to an on-going evaluation which included observance of his aggressive behaviors. However, JJ's evaluation wasn't completed until the end of the 2007-08 school year, so the evaluation became the basis for his first IEP which was implemented at the start of the 2008-09 school year.

However, there was a delay in formalization and implementation of behavior strategies because JJ was taken out of Craig Elementary School (by his plaintiff mother) for a time period, then re-enrolled.  However, a short time after he was re-enrolled, SSD completed a draft BIP for consideration by the IEP Team, which then modified it, and incorporated it into the October 6, 2008 IEP.

The evidence further shows that between JJ's re-enrollment and the October 2008 IEP, SSD was addressing JJ's behavior through a variety of strategies and interventions.  JJ was supervised by two (2) teachers who were assisted by a rotation of three (3) SSD teachers.  JJ was provided with preferential seating, allowed to move about the classroom, given directions in a variety of ways, given non-verbal cues and prompts; and his teachers were consistently checking him for understanding of instructions, providing him with eye contact, standing near him for immediate assistance, permitting him to take breaks, varying his activities, using a visual (picture) schedule, pre-macking his activities, and providing him with advance notice of transitions.  The evidence further shows that despite this multitude of strategies to address JJ's aggressive behavior in a classroom of other children, his behavior problems did not decrease in either quantity or intensity.

JJ's October 2008 IEP called for a transfer to a public separate day school (Litzsinger) for safety concerns regarding both JJ and his classmates.  Furthermore, the change in placement was intended to address the additional concern that JJ's academic progress, as well as his classmates' academic progress, was being impeded by JJ's behavior.  All the educators involved in the change of placement decision supported the decision, including the use of support rooms and/or SORs when necessary to address JJ's aggressive and dangerous behavior.

During the 2008-09 school year, while at Litzsinger, JJ's referrals to the SOR decreased over the span of the school year. JJ was in a small classroom environment (4-8 classmates) with a single teacher assisted by two (2) to three (3) paraprofessional assistants throughout the day. The consistent testimony before the Hearing Panel was that use of the SOR was a "last resort". JJ's teacher Ms. Engelhardt testified consistently that she tried a variety of strategies and interventions to address JJ's behavior problems and only referred him to the SOR when his behavior constituted a safety concern for himself or others and all the other in-classroom strategies had proven unsuccessful. There is no evidence before the Court (or the Hearing Panel) that JJ did not make "some" educational progress during the 2008-09 school year.

The evidence before the Hearing Panel is overwhelming that SSD was at a disadvantage in addressing JJ's academic and behavior development for the 2009-10 school year. His parents did not bring him to school the first day, brought him the second day and then took him back home, and did not return him to school until almost two (2) weeks later (end of August 2009). JJ's parents wanted the IEP Team reconvened and use of the support room and/or SOR eliminated from his IEP. Before making a decision, SSD agreed to temporarily cease use of the SOR and have an outside consultant (Touch Point) observe and assist in evaluating JJ's behavior. Meanwhile, a variety of strategies and interventions were used to address JJ's escalating aggressive behavior; however, his behavior ultimately resulted in two (2) suspensions. JJ was suspended on September 3, 2009 (he had been in school only since August 24), and again on September 14, 2009 after which his parents did not return him to Litzsinger. Thus, JJ was enrolled and attending Litzsinger School only for a very short period of time during which he was subject to further evaluation by both SSD and Touch Point.

The evidence shows that several meetings were held between September 2009 and November 2009.  The evidence shows that when JJ's teachers were able to fully implement his IEPs, including use of the SOR, JJ's behavior and ultimately his academic goals were being achieved; however, when in-class strategies were not coupled with use of a support room and/or SOR, attainment of his academic and behavior goals were compromised.

SSD would not eliminate use of the support room and/or SOR from JJ's November 2009 IEP, The evidence shows that all educators involved with JJ, and the outside consultant Touch Point, agreed that use of the SOR was a necessary component of JJ's educational program.

The Court has carefully reviewed both <u>Neosho</u>, *supra.* and <u>Lathrop</u>, *supra.* and find that both of these cases present situations markedly different from the present case.  In <u>Neosho</u>, the challenged IEP plan did not have a cohesive behavior management plan in place but rather simply had attachments that "were merely short-term goals and objectives that did not provide specific interventions and strategies to manage [the student's] behavior problems.".  <u>Neosho</u>, at 1025.  The Eighth Circuit concluded that the district court was correct in finding that the IEP team had failed to adopt or implement anything that would be "sufficient to amount to a cohesive behavior management plan" and the administrative record showed only that the disable child made only "slight" or "de minimis academic and social progress".  <u>Neosho</u>, at 1029; *see also*, <u>K.E. v. Indep. Sch. Dist. No. 15</u>, at 810 (analyzing <u>Neosho</u>).  Furthermore, the Court held that the IEPs were deficient because any educational benefit that the child did receive was then "lost due to [the] behavior problems that went unchecked.".  <u>Neosho</u>, at 1029; <u>K.E. v. Indep. Sch. Dist. No. 15</u>, at 810.

That is not the situation here.  The overwhelming evidence before the Hearing Panel is that JJ was subject to continuing observations and evaluations by his teachers (both at Craig and

Litzsinger) and that numerous strategies and interventions designed with specific positive behavior goals were implemented continuously with JJ.  Furthermore, the overwhelming evidence shows that there was not indiscriminate use of the SOR, but rather it was a "last resort" after all other strategies had failed; and furthermore, that by the end of the 2008-09 school year its use was drastically decreasing.  SSD had created a "cohesive behavioral management plan" for JJ at the start of the 2008-09 school year which it began initially implementing at Craig School and then modified it and more fully incorporated it into JJ's October 2008 IEP.  Even if there were some deficiencies in the October 2008 IEP , there is no evidence that JJ's behavioral problems were not sufficiently controlled by the October 2008 change in placement IEP and prohibited him from receiving a FAPE.  *See*, <u>K.E. v. Indep. Sch. Dist. No. 15</u>, *supra.*

Even if no "formal written" BIP was in place prior to the October 2008 IEP implementing a change in placement, it is clear that JJ's behavior problems were being addressed at Craig; however, unfortunately, not successfully.  It is also clear from the evidence that neither the staff nor the physical facility at Craig were equipped to successfully address JJ's behavior problems. Again, all those with first-hand knowledge of JJ's behavioral problems and their effect on his academic progress (except for his parents) agreed that transferring JJ to Litzsinger was necessary.

Again, SSD was only required to provide JJ with individualized education and services sufficient to provide him with **some** educational benefit.  SSD has met this obligation because the challenged IEPs set out clearly JJ's present levels of education, measurable goals for the targeted school years, enunciated special services and accommodations for JJ, and adequately considered positive behavioral interventions and strategies.

Similarly, the <u>Lathrop</u> decision does not support the plaintiff's position.  In <u>Lathrop</u>, the Eighth Circuit upheld the district court's ruling that the Hearing Panel had erred in finding that

26

the challenged IEPs were deficient for not sufficiently addressing the child's behavior problems.[22] Both courts agreed that the IEPs had adequately addressed the child's behavior problems.  Both courts concurred that the IDEA does not require any specific written plan to be incorporated into an IEP, only that if behavior problems are viewed as impeding the child's academic progress, the IEP team should **consider** the use of positive behavioral interventions and strategies to address such behavior problems.  Lathrop, at 425.  Furthermore, the Lathrop, Court again noted that not only does the IDEA not mandate inclusion in an IEP of a behavior plan but also does not mandate behavioral improvements as a benchmark for a FAPE.  Id., at 426.  The Court found that the challenged IEPs both described the disabled child's disruptive behaviors and included "a host of strategies to address them.".  Id., at 425.  The Court held that since the disabled child's IEPs did contain detailed behavioral interventions, and the IDEA does not require behavioral improvement (although the subject disabled child did exhibit behavioral progress in some of the noted areas), the Hearing Panel had erred in concluding that the defendant school district had failed to provide a FAPE due to perceived behavioral deficiencies.  Id., at 427.

Again, in the instant case, the preponderance of the evidence is that the challenged IEPs did contain detailed behavioral interventions, and that these strategies and interventions were implemented in hopes of attaining the enumerated academic and behavioral goals outlined in the challenged IEPs.  SSD completed a comprehensive initial behavioral evaluation, conducted a functional behavioral assessment, and effectuated a change of placement that resulted in

---

[22]This was only one of several issues before the district court and the appellate court; however, the issue of the child's behavior problems is the only one pertinent to the instant case.

improved behaviors.  The preponderance of evidence demonstrates that under both <u>Neosho</u> and

<u>Lathrop</u>, JJ did receive a FAPE pursuant to the challenged IEPs.

  Plaintiff further argues that the challenged IEPs failed to provide JJ with a FAPE in the

"least restrictive environment".  She argues that "mainstreaming" JJ in a regular classroom is the

primary goal under the IDEA, and that this goal can be achieved.  She utilizes JJ's "homebound

instruction" experience in support of this argument.  Plaintiff's argument is meritless.

  Firstly, the IDEA's preference for "mainstreaming"[23] is not absolute.  The IDEA clearly

indicates that although the "least restrictive environment" is encouraged; special classes, separate

schooling or "other removal of children with disabilities from the regular educational

environment" is proper "when the nature or severity of the disability of a child is such that

education in regular classes with the use of supplementary aids and services cannot be achieved

satisfactorily.".  20 U.S.C. §1412(a)(5)(A); *see*, <u>Pachl v. Seagren</u>, 453 F.3d. 1064, 1067-68 (8th

Cir. 2006).  All of the educators, and a unanimous Hearing Panel[24] agreed that a change in

placement to Litzsinger, and use of the SOR was necessary in order to provide JJ with a FAPE.

*See*, <u>Pachl</u>, at 1069 (the Court finds determinative that majority of educators agreed that IEP

providing for 70% time in regular school environment instead of 100% time was adequate and

appropriate for disabled child under the IDEA).

  Secondly, JJ's behavior at the University City Public Library for his homebound

instruction is not evidence that the challenged IEPs are deficient and that the change in placement

---

  [23]The concept wherein disabled children attend regular public school clases with non-disabled children. *See*, 20 U.S.C. §1412(a)(5)(A).

  [24]Hearing Panel member Dayna Deck filed a separate opinion; however, she concurred with the other two members that a change in placement to Litzsinger and use of the SOR was necessary for JJ's academic and behavioral progress.

was not necessary to provide JJ with a FAPE in the "least restrictive environment".  The learning environment at the library is vastly different than one in a regular classroom.  JJ was the only student being taught and had his teacher's undivided attention.  He was in the presence of adults only; notably his mother.  He had no interactions, either voluntarily or involuntarily, with other children his age. He sat at the same table the entire time he was being instructed.  He did not have to make any "transistions"; he did not have to "share" any adult's attention with other children; he did not have to behave socially in any manner with his peers.  Even so, his homebound teacher Ms. Jackson testified that he still got distracted, still threw objects in frustration, still required frequent breaks, still talked back, and still engaged in some physical aggression.  Most importantly, she testified that she did not believe that JJ was ready to be returned to a regular/general education classroom.  She further testified that she believed that JJ should first transition to a SSD school where use of a SOR was available.  No teacher or behavior expert that has actually worked with or observed JJ for any  length of time has testified to the contrary.

IEPs are typically examined from the perspective of the time when they were written. *See*, Park Hill, at 767.  Even if JJ was exhibiting less destructive behaviors at the library (albeit a somewhat artificial learning environment), this does not negate the adequacy of the challenged IEPs from prior years.  Furthermore, the IDEA does not require a school district to provide a child with the specific educational placement that the disabled child's parents prefer.  T.F. et. al. v. Special School Dist. of St. Louis County, et. al., 449 F.3d. 816, 821 (8th Cir. 2006)(*citing* Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d. 648, 658 (8th Cir. 1999); Bradley v. Arkansas Department of Education, 443 F.3d. 965, 975-76 (8th Cir. 2006)(*citing* Blackmon, *supra.*).

29

Finally, although not directly asserted in her pleadings, there was substantial testimony before the Hearing Panel regarding the "injured finger incident" and Hearing Panel member Deck addressed it briefly in her concurring opinion.  Evidently, plaintiff Clark raised before the Hearing Panel some concern that the challenged IEPs were deficient because use of the SOR endangered JJ and evidence of this was his finger injury of May 2009.  The testimony before the Hearing Panel was consistent that this injury was self-inflicted by JJ during a tantrum.  Furthermore, the evidence before the Hearing Panel was that the incident was investigated by not only SSD but by state investigators and the accused paraprofessional was exonerated.  There was no credible evidence before the Hearing Panel that use of the SOR would endanger JJ; in fact, the overwhelming evidence was that the use of the SOR protected JJ, SSD staff, and JJ's classmates.

Plaintiff has provided little, if any support, in the record that the IEPs were not reasonably calculated to provide some educational benefit to JJ, and that JJ was not provided a FAPE in the least restrictive learning environment suited for both his academic and behavioral needs.  The Court finds that the Hearing Panel properly weighed and considered the credibility of all testimony and evidence before it.  There is nothing before the Court to suggest that the Hearing Panel improperly evaluated the evidence or failed to give sufficient weight to all experts in reaching its decision.  The placement of JJ at Litzsinger School, in consideration of his academic and behavioral needs, including the use of a support room and/or SOR, is supported by a preponderance of the evidence, consistent with the IDEA, and is entitled to deference by this Court.  The plaintiff has failed to carry her burden to demonstrate otherwise.

Accordingly, the Court can find no material procedural or substantive errors in JJ's IEPs and based upon the record before the Hearing Panel, said IEPs did not violate the IDEA.  The

Court will grant SSD's motion for judgment on the record, and deny plaintiff Clark's motion for

judgment on the record.

Dated this 23rd day of February, 2012.

_____

UNITED STATES DISTRICT JUDGE

31